**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**ROANOKE DIVISION**

| | | |
|---|---|---|
| **NICOLE S.,**[1] | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No. 7:20-cv-00368** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **KILOLO KIJAKAZI,**[2] | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

Plaintiff Nicole S. ("Nicole") filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") determining that she was not disabled and therefore not eligible for supplemental security income ("SSI") under the Social Security Act ("Act"). 42 U.S.C. §§ 1381–1383f. Nicole alleges that the Administrative Law Judge ("ALJ") erred by failing to properly: (1) weigh the opinions of her treating physician assistant and consultative examiner; (2) assess her mental impairments; (3) determine her RFC using a function-by-function analysis; and, (4) assess her allegations regarding her symptoms.

I conclude that substantial evidence supports the Commissioner's decision in all respects. Accordingly, I **RECOMMEND GRANTING** the Commissioner's Motion for Summary Judgment (Dkt. 20) and **DENYING** Nicole's Motion for Summary Judgment (Dkt. 17).

## STANDARD OF REVIEW

---

[1] Due to privacy concerns, I am adopting the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States that courts use only the first name and last initial of the claimant in social security opinions.

[2] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi is hereby substituted for Andrew Saul as the defendant in this case.

This court limits its review to a determination of whether substantial evidence exists to support the Commissioner's conclusion that Nicole failed to demonstrate that she was disabled under the Act.[3] Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations and alterations omitted); see also Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (emphasizing that the standard for substantial evidence "is not high"). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." Mastro, 270 F.3d at 176 (quoting Craig v. Chater, 76 F.3d at 589). Nevertheless, the court "must not abdicate [its] traditional functions," and it "cannot escape [its] duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

## **CLAIM HISTORY**

Nicole protectively filed for SSI in January 2013, claiming her disability began in September 2004 due to paraxomal supra ventricular tachycardia ("SVT"), anxiety, panic attacks, depression, irritable bowel syndrome, asthma, and a thyroid condition. R. 305, 320, 644.

---

[3] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work. Rather, a claimant must show that his impairments prevent him from engaging in all forms of substantial gainful employment given his age, education, and work experience. See 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

Nicole's application was denied at the initial and reconsideration levels of administrative review. R. 215, 227. In January 2016, ALJ Geraldine Page held an administrative hearing and issued an unfavorable ruling on March 21, 2016. R. 152–62. Nicole appealed the ALJ's decision to the Appeals Council, but her request for review was denied on April 7, 2017. R. 1–4. Nicole then filed a complaint in this court seeking review of that final administrative decision. This court ultimately remanded the case to the Commissioner for additional consideration under sentence four of 42 U.S.C. § 405(g). R. 721–32. The Appeals Council then vacated the prior decision of the Commissioner and remanded the case to the ALJ. R. 735–36. Upon remand, the Appeals Council instructed the ALJ to "proceed consistent with the District Court remand order" and consolidate the claim with a new SSI claim filed on May 24, 2017. R. 152, 735.

On December 17, 2019, ALJ Page conducted another hearing at which Nicole was represented by counsel and vocational expert Timothy Wickford testified.[4] R. 679–711. On March 2, 2020, the ALJ entered her decision analyzing Nicole's consolidated claims under the familiar five-step process,[5] and denying Nicole's claim for disability. R. 644–69. The ALJ found that Nicole suffered from the severe impairments of asthma, SVT, panic and anxiety disorders, cervical degenerative disc disease, lumbar degenerative disc disease, right clubfoot, arthritis, and obesity. R. 647. The ALJ determined that these impairments, either individually or in

---

[4] The ALJ also held a brief hearing in June 2019; however, that hearing was continued because the ALJ granted Nicole's request for a consultative examination. R. 714–18.

[5] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can perform other work. Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R. § 404.1520); Heckler v. Campbell, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. The burden shifts to the Commissioner at the fifth step to establish that the claimant maintains the residual functional capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

combination, did not meet or medically equal a listed impairment. R. 648. The ALJ specifically

considered listing 3.03 (asthma), 4.05 (recurrent arrhythmias), 1.04 (disorders of the spine), 1.02

(major joint dysfunction), and 12.06 (anxiety and obsessive-compulsive disorders). R. 648–51.

The ALJ also considered Soc. Sec. Ruling 19–2 Titles II and Xvi: Evaluating Cases Involving

Obesity, SSR 19–2p, 2019 WL 2374244 (S.S.A. May 20, 2019). The ALJ found that regarding

her mental impairments, Nicole had mild limitations in understanding, remembering, or applying

information and adapting or managing oneself and moderate limitations in concentrating,

persisting, or maintaining pace and interacting with others. R. 649–51.

The ALJ concluded that, through the date last insured, Nicole retained the residual

functional capacity ("RFC") to perform a limited range of light work. Nicole can only

occasionally climb ramps and stairs, balance, kneel, crawl, stoop, crouch, and reach overhead,

must avoid even moderate exposure to extreme temperatures, excess humidity, and pulmonary

irritants, must avoid all exposure to hazardous machinery, work at unprotected heights, climbing

ladders ropes, and scaffolds, and work on vibrating surfaces. R. 651. Additionally, Nicole is able

to understand, remember, and carry out simple instructions in repetitive, unskilled work, is able

to attend, persist, and concentrate for two-hour segments with normal breaks as allowed by the

employer, and is able to complete a normal eight-hour work day/40-hour week in work that

involves no interactions with the general public and only occasional interactions with co-workers

and supervisors. Id. Nicole is able to respond appropriately to supervision, coworkers, and usual

work situations. However, the job cannot have excessively loud background noise such as heavy

traffic or jackhammering type construction equipment in the immediate work environment. Id.

Nicole may be off task up to five minutes an hour, which can be accommodated during normal

4

breaks, and may miss up to one day a month due to her medically determinable impairments and symptoms. Id.

The ALJ concluded that Nicole was unable to perform her past relevant work as a fast-food worker, customer service representative, cashier, housekeeper, waitress, and telemarketer. R. 667. However, Nicole could perform other jobs that exist in significant numbers in the national economy, such as marker, garment sorter, and folding machine operator. R. 668. Thus, the ALJ concluded that Nicole was not disabled. Nicole did not file written exceptions to the ALJ decision and the Appeals Council did not review the decision on its own motion. Nicole filed for direct review of the unfavorable ALJ decision in this court. See 20 C.F.R. § 404.984(d); Massey v. Saul, 1:19 CV 152 WCM, 2020 WL 4569606, at *1 (W.D.N.C. Aug. 7, 2020) (explaining appeals process).

## ANALYSIS

Nicole alleges that the ALJ failed to properly weigh her physician assistant and consultative examiner's medical opinions, properly assess her mental impairments, determine her RFC using a function-by-function analysis, and assess her allegations regarding her symptoms.

### A. Medical History Overview

1. Physical Health

Nicole sought treatment on multiple occasions during the relevant period at the emergency room for mostly physical complaints, including abdominal, neck, back, shoulder, foot and arm pain, thyroid issues and related fatigue, headaches, and symptoms related to her SVT, including chest pain and rapid heart rate. See, e.g., R. 1159, 1128 (SVT); R. 1169 (arm and shoulder pain); R. 1171 (abdominal pain); R. 103, 505, 608 (back and neck pain); R. 503 (headache); R. 510 (thyroid). Her providers occasionally noted that these physical symptoms

were related to anxiety, and some providers expressed concern, especially at the beginning of the

relevant period, that Nicole was engaged in drug-seeking behavior. See, e.g., R. 1169, 1220.

Nicole also regularly treated for these complaints with her primary care providers.

In May 2013 Nicole presented to the emergency room for arm pain, hypertension, and

anxiety. R. 461–62. Nicole reported intermittent palpitations and the attending physician

diagnosed her with SVT, among other conditions. R. 464. Nicole again reported to the

emergency room in November 2013 after experiencing palpitations and associated heart racing

and chest pain. R. 484. Her physical exam revealed normal heart rate, rhythm, sounds, pulses,

and her symptoms subsided over time. R. 484. Her attending physician noted that her symptoms

were consistent with SVT and he increased her medication dosage. R. 485.

Between 2014 and early 2015, Nicole reported instances of lightheadedness, dizziness,

and headache to emergency room physicians and her primary care provider, Victor Bell, M.D.

R. 503, 527–28. She reported no episodes of SVT and her physical exams generally revealed that

her heart had a regular rate and rhythm. R. 503, 528. In March 2015, Nicole reported to the

emergency room complaining of palpitations, rapid heart rate, and tremors. R. 510. The attending

physician noted Nicole had palpitations and rapid heart rate, but he concluded that her EKG,

chest x-rays, and labs were acceptable. R. 479, 513. At a follow-up appointment with Dr. Bell,

Nicole reported no further SVT problems and Dr. Bell suggested no change in treatment. R. 564.

Nicole reported to the emergency room several additional times in 2015 and 2016,

generally for concerns stemming from chest pain and potential anxiety. See, e.g., R. 600, 605,

619, 1029, 1099. Objective measures at these visits suggested normal cardiovascular functioning.

Follow-up with Dr. Bell similarly suggested regular heart rhythm and rate, but Nicole did

complain of chronic fatigue and headaches. R. 634. At one appointment, Nicole admitted she had

not been taking her SVT medication, but "she denie[d] any worsening symptoms." R. 1099.

Nicole continued to follow-up with her primary care providers and presented at the

emergency room throughout the relevant period. See, e.g., R. 980, 1984. Nicole less frequently

complained of SVT issues and more frequently complained of musculoskeletal pain. Nicole

reported pain in her back, neck, and arms, which she treated through medication, injections, and

physical therapy. See, e.g., R. 1004, 1067, 1096, 1101. Her gait was frequently normal during

this period and her providers often found that Nicole had a full range of motion in her

extremities. R. 2045, 2181, 2287 (showing normal gait); R. 65–66, 2287, 2349 (showing full

range of motion). Nicole also complained of fatigue during this period, generally related to her

hypothyroidism. See R. 633, 978. Nicole did not consistently take her thyroid medication, and

her complaints of fatigue, while regular, were inconsistent. See, e.g., R. 103, 1048, 2080 (stating

Nicole reported no fatigue); R. 485, 980 (stating Nicole did not take thyroid medication).

2. Mental Health

Nicole sought treatment on multiple occasions throughout 2013 and 2014 at the

emergency room. See, e.g., R. 498, 505, 1143, 1158, 1162, 1169, 1172. She occasionally

complained of anxiety at these visits and at one visit her anxiety was labeled uncontrolled.

R. 1158–59. More typically, the attending physician reported that Nicole's mental status was

generally normal, though occasionally she presented with a depressed mood and flat affect. See

R. 498, 505, 1153, 1162, 1169, 1172. Nicole's primary care physician, Victor Bell, M.D.,

similarly found that Nicole had a normal mental status during this period. R. 543, 546, 554.

Nicole attended several appointments with Dr. Bell in 2015. Dr. Bell diagnosed Nicole

with panic attacks in January 2015. R. 568. At follow-up appointments later that year, Dr. Bell

indicated that Nicole was oriented, able to concentrate, and had an appropriate affect. R. 577, 580. He also noted that Nicole's anxiety, mood, and energy were normal and that she only rarely suffered from panic attacks. R. 577.

Between December 2015 and June 2016, Nicole treated with Katrina Lewis, LCP, at four appointments. R. 637, 639, 1922, 1929. At each appointment, Ms. Lewis noted that Nicole had mood swings, depression, and anxiety, however, she noted that Nicole's depression was mild and indicated some improvement in her affect over time. R. 1922. Nicole also attended several physical health-based appointments during this period and her providers treated her anxiety and depression with medication. R. 1100, 1925.

In October 2016, Nicole began treatment with Sarah Rodes, PA–C. Nicole attended regular appointments between October 2016 and July 2017. R. 946, 948–49, 2049–51. Ms. Rodes noted that Nicole's depression was of moderate severity during this period. Id. Nicole's mental status exams during this period were largely normal and she indicated some improvement, though Ms. Rodes found Nicole's concentration to be impaired. See R. 948–49, 2049–50. Nicole attended follow-up appointments with Ms. Rodes in December 2017 and April 2018. R. 2052, 2104. Nicole continued to complain of anxiety and depression, and she reported that her medication worked intermittently. R. 2052, 2104. Nicole's mental status exams at these appointments were largely normal. Id.

Nicole returned to treat with Ms. Rodes approximately one year later in February 2019. R. 2243. She attended several appointments that year. R. 2243, 2354, 2358, 2379. Nicole's mental status examinations throughout this period were relatively normal, though Ms. Rodes found that Nicole's concentration was impaired. Id. Ms. Rodes also found that Nicole's anxiety was increased though her mood disorder was stable. Id.

3. Opinion Evidence

State agency psychologists Alan Entin, Ph.D., and Bryce Phillips, Psy.D., reviewed the record in 2013 and 2014, respectively, and determined that Nicole's mental impairments were non-severe. R. 209, 221. They both noted that Nicole's anxiety symptoms were controlled with medication and that exams showed normal memory, judgment, and orientation. The ALJ gave these opinions some weight. R. 664.

State agency physicians Paula Nuckols, M.D., and Tony Constant, M.D., reviewed the record in 2013 and 2014, respectively, and determined that Nicole had certain exertional, postural, and environmental limitations, but that she was capable of medium work. R. 210–12, 223–25. The ALJ gave these opinions some weight. R. 667.

In November 2019, Ms. Rodes completed a Medical Opinion Re: Ability to Do Work-Related Activities (Mental) indicating Nicole would have moderate limitations in maintaining regular attendance, completing a normal workday, dealing with normal work stress, and interacting with the general public. R. 2374–76. Ms. Rodes found that Nicole's work attendance would be "impaired due to panic attack" and that Nicole would miss work more than three times per month. Id. The ALJ gave this opinion limited weight. R. 664. Ms. Rodes also completed an assessment in June 2018, which reported Nicole's anxiety, but did not include any work limitations. R. 2110–14. The ALJ did not weigh this opinion as it included no work limitations.

Jeffrey Luckett, Ph.D., performed a consultative mental status evaluation in August 2019. R. 2336–41. Dr. Luckett diagnosed unspecified depressive disorder (mild to light moderate), social anxiety and panic disorder, mild agoraphobia, somatic symptoms disorder with predominant pain (persistent – mild), and moderate tobacco use disorder. R. 2340. Nicole completed 30/30 items correctly on the cognitive screening evaluation. Id. Dr. Luckett concluded

9

that Nicole should not work with the general public, but she could work with peers and supervisors under certain conditions. Id. He further noted that she could perform simple and repetitive tasks and that she could handle the typical stressors involved in competitive work. He ultimately concluded Nicole "could be gainfully employed on at least a half to three-quarter time basis." R. 2340. The ALJ gave this opinion some weight. R. 665.

Dr. Bell completed opinions in August 2015 and January 2020. R. 574, 2383. Dr. Bell diagnosed Nicole with generalized anxiety disorder, panic disorder with agoraphobia, and episodic tachycardia. Id. (diagnosing Nicole with panic and bipolar disorder and syncope in 2015). He noted that Nicole's diagnoses severely limit her ability to support herself, noting that she could possibly become self-supporting with treatment but it was doubtful. Id. The ALJ gave these opinions little weight. R. 665.[6]

### B. Treating Physician Assistant and Consultative Examiner Opinions

Nicole argues that the ALJ's decision to give only some weight to Dr. Luckett and limited weight to Ms. Rodes is not supported by substantial evidence. Nicole argues that these two opinions are consistent with each other and the record and should have been given greater weight.[7]

Ms. Rodes

Ms. Rodes, as a certified physician assistant, is not an acceptable medical source as defined by the Act. 20 C.F.R. § 416.927. The opinions of non-acceptable medical sources are not

---

[6] Evelyn Adamo, Ph.D., also answered medical interrogatories in this case in December 2018. R. 663, 2231–36. Dr. Adamo stated there was insufficient data to assess Nicole's mental conditions. Id.

[7] Nicole filed her original claim for SSI in January 2013. She filed a second claim in May 2017. The ALJ consolidated these two cases. Although not addressed by the parties' briefs, it appears that Nicole's second claim, though filed after March 27, 2017, is subject to the prior regulations. See Social Security Administration, Program Operations Manual System (POMS), DI 24503.050.D.2, https://secure.ssa.gov/apps10/poms nsf/lnx/0424503050. See Floyd v. Saul, No. 5:20–cv–5–KS, 2021 WL 879065at *4 n.3 (E.D.N.C. Mar. 9, 2021).

entitled to any particular weight, and the ALJ is not required to explain the weight given to such opinions unless it might affect the case's outcome. See Adkins v. Colvin, No. 4:13–cv–00024, 2014 WL 3734331, at *3 (W.D. Va. July 28, 2013); see also Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996).

Nevertheless, the ALJ has a duty to consider all of the evidence available in a claimant's case record, including evidence provided from medical sources who are not "acceptable medical sources" such as a physician assistant.[8] Ingle v. Astrue, 1:10–cv–141, 2011 WL 5328036, at *3 (W.D.N.C. Nov. 7, 2011) (citing SSR 06–03p). While evidence from these non-acceptable medical sources cannot be used to establish the existence of a medically determinable impairment, "such sources may provide evidence, including opinion testimony, regarding the severity of the claimant's impairments and [how] such impairment[s] affect the individual's ability to function." Id.; see also Ledbetter v. Astrue, 8:10–cv–00195, 2011 WL 1335840, at *10 (D.S.C. April 7, 2011) ("[O]pinions from medical sources, even when not 'acceptable medical sources,' are important and should be evaluated on key issues such as impairment severity and functional effects") (citing SSR 02–03p).

Here, the ALJ appropriately considered the factors and the record in determining Ms. Rodes's opinion merited only limited weight. While the ALJ acknowledged Nicole's treatment relationship with Ms. Rodes, she found that her opinion was inconsistent with the medical record. R. 664.

---

[8] To determine the weight given to the opinion of a source who is not an "acceptable medical source" as defined by the Act, the ALJ should consider: (1) the length of time the source has known the claimant and the frequency of their contact; (2) the consistency of the source's opinion with the other evidence; (3) the degree to which the source provides supportive evidence; (4) how well the source explains his or her opinion; (5) whether the source has an area of specialty or expertise related to the claimant's impairments; and (6) any other factors tending to support or refute the opinion. Beck v. Astrue, No. 3:11–cv–00711, 2012 WL 3926018, at *12 (S.D.W. Va. Sept. 7, 2012) (citing SSR 06-03p).

Ms. Rodes specifically relied on Nicole's panic attacks to support her conclusion that she would be absent more than three times per month. R. 2375, 2377 ("[Nicole's] work attendance likely to be impaired due to panic attacks"). The ALJ noted that while the record supports a history of panic attacks, that "[t]he record does not indicate frequent, intense panic attacks in which [Nicole would be] unable to function." R. 664. The ALJ supported this with evidence from the record showing that Nicole often told her treating physicians that she was not suffering from panic attack symptoms. See R. 117, 135, 1090, 1099, 2122, 2140, 2250 ("[P]anic attacks have been stable on medications and [Nicole] denies any worsening symptoms today."); see also 557, 1100, 1919. Further, except for a few emergency room visits, the ALJ noted that Nicole's providers did not observe her experiencing panic attack symptoms at her appointments, often noting that her mental status was largely normal. See, e.g., R. 975, 1048, 1922. The ALJ therefore emphasized that the degree of absenteeism described by Ms. Rodes was not supported by the record. R. 664.

The ALJ also noted that "[t]he record does indicate [Nicole] would have difficulty dealing with the public." Id. Nevertheless, the ALJ concluded that such difficulty would not preclude her from competitive work and did not support Ms. Rodes's opinion regarding Nicole's absenteeism. Specifically, the ALJ explained that despite Nicole's anxiety, she was still able to function, noting that Ms. Rodes's treatment notes stated that while "[N]icole reports significant anxiety in public/grocery store etc. she is able to complete [activities of daily living]." R. 2111; see also R. 2340 (finding Nicole has "[n]o difficulty in the performance of [activities of daily living]"); R. 221. The ALJ also considered that despite her anxiety, "[Nicole] provid[ed] some care for her family members . . . coped with a [legal] charge, [] sought joint custody of her niece," and interacted with a number of healthcare providers. R. 663. Similarly, the ALJ found

12

that while Ms. Rodes indicated some impairment in concentration in her treatment notes, that her assessment was not based on any cognitive function testing and that she was able to maintain her activities of daily living and, for part of the relevant period, engaged in caretaking for her children and niece. See R. 650, 2111–4; see also R. 578, 1949 ("[P]atient is able to concentrate and stays focused in the encounter.").

In addition to these inconsistencies with the record, the ALJ also considered Ms. Rodes's statement that she could not accurately assess Nicole's "ability to deal with detailed instructions and the stress of semiskilled and skilled work." R. 664. The ALJ noted that this conclusion appeared inconsistent with her finding that Nicole would have difficulty dealing with normal work stress given that the "ability to deal with the stress of semi-skilled and skilled work [] would be more challenging than unskilled work." Id. Similarly, the ALJ questioned the foundation of Ms. Rodes's findings, noting that in a 2018 evaluation, Ms. Rodes noted she had not formally assessed Nicole's concentration or performed psychological testing, and further suggesting that Ms. Rodes's treatment notes appeared to "carr[y] over the same findings" visit to visit. R. 663–64; 2111–14.

The ALJ's finding that Ms. Rhodes's opinion warranted only limited weight is supported by substantial evidence. Nicole's citations to contradictory statements in the medical records amounts to simply asking the court to reweigh the evidence which I will not do. See Harper v. Comm'r, No. GLR–13–909, 2014 WL 176777, at *1–2 (D. Md. Jan. 14, 2014).

Dr. Luckett

The regulations require an ALJ to evaluate a one-time evaluator, such as consultative examiner Dr. Luckett, using the factors outlined in the regulations and to expressly indicate and explain the weight she accords to such opinions. See 20 C.F.R. § 416.927.

13

Here, the ALJ appropriately considered the factors and the record in determining the weight to give Dr. Luckett's opinion, and she adequately explained why his opinion merited only some weight. The ALJ first noted that Dr. Luckett's opinion, at least concerning Nicole's anxiety and panic attacks, was internally inconsistent as it relied in part on Nicole's subjective reports. R. 665. Specifically, the ALJ noted that Dr. Luckett reported that Nicole was oriented, had a "pleasant, positive and engaged mood," presented only with "a mild range of depression," and did not show any "overt anxiety symptomatology." R. 2336–41. Ultimately, Dr. Luckett concluded that Nicole "d[id] not appear to be in any significant psychological distress or turmoil at the time of [the] evaluation" and that "[s]he was completely appropriate in her presentation and manner." Id. Nevertheless, Dr. Luckett based at least in part on Nicole's reports of "difficulties going to her doctor's office, the mall, grocery stores etc." concluded she could "be gainfully employed on at least a half to three-quarter time basis." Id. The ALJ suggested that Dr. Luckett's general conclusion was inconsistent with his mild findings at the consultative examination and, thus, indicated he relied on Nicole's subjective reports. R. 665; see also Johnson v. Barnhart, 434 F.3d 650, 658 (4th Cir. 2005) (suggesting less weight may be given to a treating physician opinion that is primarily based on subjective complaints).

The ALJ also found that Dr. Luckett's social interaction limitations were not supported by the record. The ALJ noted that Nicole's statement that she "tend[s] to freak out even if I've got a doctor's appointment," that Dr. Luckett suggested he relied on, was not supported by the record. Specifically, the ALJ noted that Nicole had a long history of treatment, even with "random" emergency room doctors and that "the record does not actually indicate a particular difficulty dealing with providers" perhaps barring an exchange prior to the relevant period. R. 663, 665. The ALJ also noted that while the record does indicate substantial difficulty in

14

dealing with the public that Dr. Luckett and other providers found that Nicole had "[n]o difficulty in the performance of [her activity of daily living]." R. 2340. The ALJ further found that Nicole did not indicate to her providers that she was highly upset even when involved in a custody issue. R. 665.

Accordingly, the ALJ's finding that Dr. Luckett's opinion warranted only some weight is supported by substantial evidence.

### C. Mental Impairments under SSR 96–8P

Nicole argues that the ALJ failed to properly assess her mental impairments as required by SSR 96-8P. See Titles II & Xvi: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P (S.S.A. July 2, 1996). Specifically, Nicole asserts that the ALJ failed to properly consider her moderate limitations in concentration, persistence, or pace and interacting with others by "only address[ing] [Nicole's] ability to perform work and not [her] ability to sustain work." Pl.'s Br. at 41, Dkt. 18.

SSR 96-8P requires the ALJ to include a narrative discussion describing how the evidence supports his conclusions when developing the RFC. Teague v. Astrue, No. 1:10-cv-2767, 2011 WL 7446754, at *8 (D.S.C. Dec. 5, 2011).   The ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8P at *7; Meadows v. Astrue, No. 5:11-cv-63, 2012 U.S. Dist. LEXIS 115150, at *24, 2012 WL 3542536, at *8 (W.D. Va. Aug. 15, 2012) (citing Davis v. Astrue, No. 9-cv-2545, 2010 U.S. Dist. LEXIS 132972, at *15-16, 2010 WL 5237850, at *5 (D. Md. Dec. 15, 2010)); Monroe v. Colvin, 826 F.3d 176, 189, (4th Cir. 2016) (emphasizing that the ALJ must "build an accurate and logical bridge from the evidence to his conclusion" and holding that remand was appropriate

when the ALJ failed to make "specific findings" about whether the claimant's limitations would cause him to experience his claimed symptoms during work and if so, how often).

In <u>Shinaberry v. Saul</u>, the Fourth Circuit clarifies that an "ALJ cannot summarily 'account for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work,' because 'the ability to perform simple tasks differs from the ability to stay on task.'" <u>Shinaberry v. Saul</u>, 952 F.3d 113, 121 (4th Cir. 2020) (quoting <u>Mascio v. Colvin</u>, 780 F.3d 632, 638 (4th Cir. 2015)). However, <u>Mascio</u> does "not impose a categorical rule that requires an ALJ to always include moderate limitations in concentration, persistence, or pace as a specific limitation in the RFC." <u>Id</u>. In contrast, <u>Shinaberry</u> highlights "sister circuits" who conclude that "limiting the hypothetical to include only unskilled work sufficiently accounts for such limitations [in concentration, persistence, or pace]" when the "medical evidence demonstrates that a claimant can engage in simple, routine tasks, or unskilled work, despite [these] limitations." <u>Id</u>. (quoting <u>Winschel v. Comm'r of Soc. Sec.</u>, 631 F.3d 1176, 1180 (11th Cir. 2011)). <u>Shinaberry</u> further confirms that <u>Mascio</u> does not broadly dictate that a claimant's moderate impairment in concentration, persistence, or pace always translates into a limitation in the RFC, but instead underscores the ALJ's duty to adequately review the evidence and explain the decision. <u>See also</u> <u>Monroe</u>, 826 F.3d 176 (emphasizing that the ALJ must provide a sound basis for his ruling, including discussing what evidence he found credible and specifically applying the law to the record).

This is not a situation like <u>Mascio</u>, where the ALJ summarily concluded that a limitation to simple, unskilled work accounts for the claimant's moderate impairment in concentration, persistence, and pace without further analysis. Unlike the claimant in <u>Mascio</u>, the medical evidence here supports the ALJ's conclusion that, despite her moderate limitations in

concentration, persistence, or pace, Nicole is capable of performing the basic mental demands of light work, with the specified accommodations. See R. 663–66.

The ALJ adequately supported her finding that Nicole could sustain repetitive, unskilled work over a normal workday. The ALJ acknowledged the medical record and Nicole's testimony indicating social anxiety and "some concentration difficulty," and accounted for five-minutes of off-task time per hour. R. 664. The ALJ noted, however, that the record did not indicate frequent, intense problems with anxiety and that providers often labeled Nicole's depression as mild and, even when labeled as moderate, records did not indicate greater symptoms such as tearfulness. R. 663–66. The ALJ further questioned Ms. Rodes's notations that Nicole's attention was impaired, stating that Ms. Rodes's 2018 assessment indicated that she was unable to draw conclusions about Nicole's attention span, concentration, persistence, and task completion because those limitations were not formally assessed. R. 2111–14; see also R. 2231–36. The ALJ also considered evidence from Nicole's providers, who found her concentration intact at appointments throughout the relevant period. See, e.g., R. 655–56; see also R. 578, 581 ("[P]atient is able to concentrate and stay focused in this encounter").

The ALJ also relied on Dr. Luckett and the state agency doctors' medical opinions. The ALJ gave some weight to Dr. Luckett, who reported Nicole answered 30 out of 30 questions correctly in her cognitive capacity screening exam and had no difficulty with serial 7s or repeating words and numbers correctly after short intervals of time with distractions. R. 2340. The ALJ further relied on Dr. Luckett's finding that Nicole's ability to concentrate, persist, or maintain pace were not affected by her impairments and his conclusion that Nicole could perform simple and repetitive tasks. R. 663–65, 2340, 2342–43. The ALJ similarly gave some weight to the state agency doctors, who found that Nicole's mental health conditions were non-

severe, noting that while these doctors conducted their review early in the relevant time period, that Nicole still reported anxiety symptoms at that time. R. 663–65.

The ALJ finally noted that Nicole's activities, including some babysitting and caregiving, demonstrated some "basic concentration, persistence, and pace ability." R. 651.

Nicole also argues that the ALJ failed to explain how the RFC accommodates her moderate limitations in interacting with others. Pl.'s Br. at 43, Dkt. 18. The ALJ acknowledged that Nicole had social anxiety with crowds, public social situations, and when riding in the car with others, R. 662–64 ("The record does indicate [Nicole] would have difficulty dealing with the public."), and she specifically accommodated these impairments in the RFC, stating:

> "The [RFC] prohibition on public interaction and limitation to occasional interaction with co-workers and supervisors accommodates [Nicole's] social anxiety, as she would not have great anxiety with co-workers and supervisors given her familiarity with them and the controlled environment. The occasional interaction with co-workers and supervisors would allow her to avoid being particularly agitated as well."

R. 649; see R. 661–63, 2052 (reporting anxiety and agitation when alone).

The ALJ also found that while Nicole's anxiety and other mental conditions impacted her ability to interact with others that, on the whole, the record suggested only infrequent episodes of intense anxiety problems and panic attacks. The ALJ supported this conclusion with evidence from the record demonstrating that Nicole often reported to her providers that she was not suffering from panic attack symptoms. See R. 117, 135, 1090, 1099, 2122, 2140, 2250 ("[P]anic attacks have been stable on medications and [Nicole] denies any worsening of symptoms today."); see also R. 557, 1100, 1919. Further, except for a few emergency room visits, Nicole's providers did not observe her experiencing panic attack symptoms at appointments, often finding that her mental status was largely normal. See R. 663. The ALJ also noted that despite her anxiety, Nicole was still able to function and, in fact, Ms. Rodes indicated that while "[N]icole

reports significant anxiety in public/grocery store etc. she is able to complete [activities of daily living]." R. 2111. Dr. Luckett's opinion, which the ALJ gave some weight, similarly suggested that Nicole was able to perform her activities of daily living without incident and specifically indicated that while Nicole "would not do well working with the general public" that she "would be able to work with peers and supervisors appropriately." R. 2340.

Here, the ALJ's reasoning rests on a detailed consideration of the record evidence, and this court is not "left to guess about how the ALJ arrived at [her] conclusions." Mascio, 780 F.3d at 637. As such, I conclude that substantial evidence supports the ALJ's conclusions regarding Nicole's RFC.

### D. Physical RFC and Function-by-Function Analysis

Nicole argues that the ALJ's RFC findings are not supported by substantial evidence, specifically regarding "[w]hether [her] impairments would cause her to experience episodes of pain or fatigue necessitating breaks and how often those breaks would occur." Pl.'s Br. at 44, Dkt. 18. Nicole does not point to any specific medical records supporting a need for additional breaks, other than would be adequately accommodated by standard employer-provided breaks. Nicole's arguments amount to a disagreement with the ALJ's RFC determination and essentially ask the court to re-weigh the evidence.

A function-by-function analysis requires the ALJ to develop an adequate RFC which accounts for the work activities the claimant can perform given the physical or mental impairments affecting his ability to work.  Importantly, the ALJ must explain the conclusions reached and explain any record evidence which contradicts the RFC determination. See SSR 96-8p; see also Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016) (emphasizing that an ALJ needs to provide an explicit explanation linking medical evidence listed in the decision to his

ultimate findings). The ALJ is instructed to cite specific medical facts and non-medical evidence supporting his conclusion, discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis, describe the maximum amount of each work-related activity the individual can perform, and explain how any material inconsistencies or ambiguities in the evidence were considered and resolved. SSR 96-8p, 1996 WL 374184, at *7.

In Mascio v. Colvin, the court rejected a "per se rule requiring remand when the ALJ does not perform an explicit function-by-function analysis," agreeing instead with the Second Circuit that "'[r]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review.'" Mascio, 780 F.3d at 636 (citing Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013)). "The Mascio Court held remand was necessary, in part, because the ALJ failed to indicate the weight given to two residual functional capacity assessments which contained relevant conflicting evidence regarding the claimant's weight lifting abilities." Newcomb v. Colvin, No. 2:14–CV–76, 2015 WL 1954541, at *3 (N.D.W. Va. Apr. 29, 2015).

Here, the ALJ's decision includes the narrative discussion required by SSR 96–8p and contains sufficient information to allow meaningful review. Unlike the ALJ in Mascio, the ALJ in this case did not fail to consider conflicting medical evidence. Further, the court is "not left to guess about how the ALJ arrived at [her] conclusions" because the ALJ's findings include a comprehensive analysis of Nicole's medical records, the medical opinions, Nicole's hearing testimony, and the ALJ's conclusions. See R. 651–67.

As a preliminary matter, Nicole argues that the ALJ did not address her SVT in the RFC

findings. Pl.'s Br. at 43–45, Dkt. 18. Contrary to Nicole's argument, the ALJ directly addressed

Nicole's SVT, stating:

> The claimant testified to [SVT] spells two to three times a week. [Nicole]
> complained of symptoms from [SVT] in February 2011, and she was started on
> medication for this in October 2012. A provider did not think her symptoms were
> from [SVT] in an emergency room visit in November 2013. She had an apparent
> [SVT] episode in March 2015. The record does not show frequent episodes that
> would significantly disrupt work, and the light exertional level and prohibition on
> exposure to hazardous machinery and unprotected heights accommodates this
> issue.

R. 666–67; see also R. 652 (describing Nicole's allegations); R. 653–55, 657 (describing

Nicole's treatment history). The ALJ also adequately analyzed Nicole's associated symptoms,

fatigue and dizziness. R. 647. The ALJ specifically mentioned Nicole's fatigue in relation to

thyroid issues, but then went on to generally conclude that while Nicole occasionally complained

of fatigue, that the record does not indicate any abnormal chronic fatigue. R. 647, 653–57, 661,

663; see, e.g., R. 545, 556–57, 562, 1048, 1961 (indicating no fatigue despite SVT and other

physical conditions). The ALJ also considered Nicole's dizziness, concluding that while Nicole

occasionally reported dizziness, that these complaints were irregular and that the record did not

indicate consistent issues with dizziness or indicate associated falls. R. 647, 654–55, 660; see

also R. 600, 608, 615, 619 (denying dizziness).

The ALJ also considered Nicole's complaints of general pain, concluding that the record

did not support consistent, intense pain. The ALJ noted that prior to her application date, Nicole

occasionally refused pain medication, see R. 1281, and that some of her providers stopped

providing her with opiates for pain after her drug screen was negative for several of her

medications, R. 970. The ALJ further supported her decision with evidence from the record that

Nicole participated in some activities, such as caretaking, that did not support a need for breaks

beyond those specifically accounted for in the RFC. See 657, 666, 1093, 1114 (suggesting Nicole lifted heavy objects including rocks and a freezer); R. 661, 2052, 2240 (describing Nicole's babysitting and caretaking). The ALJ finally gave some weight to the state agency doctors, who found Nicole was capable of more strenuous medium work and did not otherwise indicate a need for breaks beyond those accounted for in the RFC.

The ALJ was only required to create a narrative discussion that builds "an accurate and logical bridge from the evidence to his conclusion," which the ALJ did in her discussion of the medical and non-medical evidence, Nicole's alleged symptoms, and the medical opinions of record. The ALJ considered Nicole's complaints and explained why the evidence did not support greater RFC restrictions. This narrative discussion allows this court to see how the evidence in the record—both medical and nonmedical—supports the ALJ's RFC determination. Because I was not "left to guess" at how the ALJ reached his RFC determination, I find that the ALJ's conclusion is supported by substantial evidence. Mascio, 780 F.3d at 637.

### E.  Subjective Allegations

Nicole argues that the ALJ's assessment of her allegations is not supported by substantial evidence. Specifically, Nicole complains that the ALJ ignored evidence concerning her SVT, back and neck pain, headaches, and anxiety, and related symptoms. Pl.'s Br. at 46, Dkt. 18. Specifically, she contends that the ALJ did not address symptoms, including pain, dizziness, soreness, and weakness, all of which require her to lie down throughout the day. Id.

When evaluating a claimant's symptoms, ALJs must use the two-step framework set forth in 20 C.F.R. § 404.1529 and SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). First, the ALJ must determine whether objective medical evidence presents a "medically determinable impairment" that could reasonably be expected to produce the claimant's alleged symptoms.

20 C.F.R. § 404.1529(b); SSR 16-3p, 2016 WL 1119029, at *3. Second, after finding a

medically determinable impairment, the ALJ must assess the intensity and persistence of the

alleged symptoms to determine how they affect the claimant's ability to work and whether the

claimant is disabled. See 20 C.F.R. § 404.1529(c); SSR 16-3p, 2016 WL 1119029, at *4.  "At

this step, objective evidence is *not* required to find the claimant disabled." Arakas v. Comm'r,

893 F.3d 83, 95 (emphasis in the original) (citing SSR 16-3p, 2016 WL 1119029, at *4–5). SSR

16-3p recognizes that "[s]ymptoms cannot always be measured objectively through clinical or

laboratory diagnostic techniques." Id. Thus, the ALJ must consider the entire case record and

may "not disregard an individual's statements about the intensity, persistence, and limiting

effects of symptoms solely because the objective medical evidence does not substantiate" them.

Id.

Nicole's argument essentially restates her arguments related to the ALJ's weighing of

medical opinions and her physical RFC findings and function-by-function analysis. Nicole does

not identify any subjective complaints that the ALJ failed to consider. Nor does she identify

specific instances in this case where the ALJ improperly applied the legal standards. Rather, she

asks this court to re-evaluate her subjective allegations and come to a different conclusion from

that of the ALJ. That is not the standard of a social security appeal.

Here, the ALJ reviewed Nicole's medical history and her subjective allegations in detail

and found that her statements regarding the severity of her limitations were not fully supported

by the objective medical evidence. The ALJ indicated that while Nicole received frequent

treatment from her providers and attending emergency room physicians that her treatment

consistent primarily of conservative measures, including medication, physical therapy, and

injections for musculoskeletal concerns. See R. 651–64. The ALJ further indicated that while

Nicole complained of fatigue and general pain throughout her treatment, that there was no indication these were abnormal or chronic conditions, and further that examining physicians indicated Nicole could still engage in her activities of daily living.

The ALJ was entitled to find that the objective medical evidence outweighed Nicole's subjective statements, and she provided a sufficient rationale for doing so. A reviewing court gives great weight to the ALJ's assessment of a claimant's subjective allegations and should not interfere with that assessment where the evidence in the record supports the ALJ's conclusions. See Shively v. Heckler, 739 F.2d 987, 989–90 (4th Cir. 1984). The ALJ's opinion was thorough and applied the proper legal standard, and I will not re-weigh the evidence. Accordingly, I conclude that the ALJ supported his analysis of Nicole's subjective complaints with substantial evidence, and that Nicole can perform work at the level stated in the ALJ's opinion.

## CONCLUSION

It is **RECOMMENDED** that an order be entered **AFFIRMING** the final decision of the Commissioner, **GRANTING** summary judgment to the defendant, **DENYING** plaintiff's motion for summary judgment, and **DISMISSING** this case from the court's docket.

The clerk is directed to transmit the record in this case to Michael F. Urbanski, Chief United States District Judge, and to provide copies of this Report and Recommendation to counsel of record.  Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within fourteen (14) days.  Any adjudication of fact or conclusion of law rendered herein by the undersigned that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings, as well as to the conclusion reached by the undersigned, may be construed by any reviewing court

as a waiver of such objection, including the waiver of the right to appeal.

Entered:  August 3, 2021

*Robert S. Ballou*

Robert S. Ballou
United States Magistrate Judge